which is case number 24-1680. So we'll proceed with that. And Mr. Capone, I see you've reserved two minutes for rebuttal. Whenever you're ready, you may begin. Thank you. Good morning, Your Honors. May it please the Court. Russell Capone on behalf of Appellant Jatik Smith. I was also a standby counsel for the trial below pursuant to the Criminal Justice Act. Recognizing that we've raised a number of issues in my limited time, I'd like to try to address the district court's decision on the border search as well as the district court's decision or failure to conduct a particularized inquiry of five defense witnesses who took the Fifth Amendment. Before we talk about the border search, there are a couple of cases. I think it's Alicigwe and Kamaldas. You're aware of those, I take it? Yes, I am, Your Honor. The Kamaldas case is fairly on point to this case. Alicigwe, I believe, involved the manual search, which is a little bit different, but yes, I am aware of those cases. So I'll start with the border search. Well, you know, on the border search, why doesn't the good faith defense kick in here given the lack of clarity in the law? Well, Your Honor, the lack of clarity in the law, I think, is the reason why there is no good faith defense. In other words, there was no binding precedent, certainly in the Supreme Court, but also in this circuit, that would have authorized a full forensic search of a cell phone. All of the Supreme Court cases on border searches involve physical searches, which is a very different animal than a full forensic search of a cell phone. The simple fact that the exception is generally understood to be broad is not enough. The fact that a couple of circuits might have, one or two circuits, might have authorized this search, but two others wouldn't have authorized this search, I think, isn't a blank check for agents to have conducted the search. At best, the law was unclear, in our view, which doesn't support the good faith exception. I'd also urge, Your Honor, given the significance of this issue, to reach the underlying question of the border search, lest it continue to come up in case after case, because it obviously is a significant issue. And this case involved the forensic search of a cell phone at the border for evidence of a paradigmatic domestic crime. Warring fire mitigation companies in Brooklyn and Queens, and allegations that one of the companies was employing local gang members to extort the others. When Mr. Smith, who was a United States citizen, returned to the country from Jamaica, he was not suspected of carrying any contraband. He was not under investigation for any offense. He had almost ten thousand dollars on him. He had less than ten thousand dollars. Does that not create some questions? It might create a question. Does it create a reasonable suspicion of him committing an international offense? Does every traveler crossing the border with a large... Well, in addition to the cash, there were some other, there were statements from others that he was engaged in activity. He had been denied entry into Jamaica. Can you add those things up? I don't think so, your honor. I'm glad you asked that, because I'd like to, there is a reference in the report to this being an investigation of extortion and money laundering, that there was something having to do with money. The report that was written after the fact, after the search was conducted. First of all, obviously does not necessarily need to be international in nature, particularly given the purely domestic nature of this case. But also, if you look at the search warrants in this case, if you look at the entire record of this case, in particular, look at the search warrant the government sought 38 days later, when they had to tell a magistrate what they were investigating, and they had to list out the subject offenses of this investigation, and that's in the record at page 256. They said this was an investigation into extortion and racketeering. The word money laundering appears nowhere in the affidavit, because this was truly not a money laundering case. This was a purely local case. On the other hand, and I haven't gotten to Riley, but I focused to start on the, I think, purely domestic nature of this case. To the extent the government has an interest at the border in investigating purely domestic crime, it's certainly very diminished compared to investigating bringing in contraband or some kind of international cross. Was there, I thought there was something in the record, though, of this particular individual having been involved in narcotics trafficking, which could have raised the suspicion as to why he was turned around and returned to the United States and not allowed entry? He has a, from many years ago, a prior conviction for narcotics, but I don't believe there's anything in the record that this investigation had anything, in the long history of this investigation, had anything to do with Not this investigation, but he had a history of narcotics. He had a narcotics history, again, purely local drug dealing. This is not a international narcotics smuggler by any offense, and again, there was nothing, as far as I understand it, about this investigation or matter that had anything to do with narcotics. On the other hand, and we haven't even gotten to Riley, as the Supreme Court has held, Mr. Smith's privacy interests in his cell phone were significant, and even at the border, that has to be balanced against the government's interest, which to the extent, again, there is a government interest here, it's very diminished, including compared to the other cases that are before this court and cases like, and other circuit court cases that have addressed this issue. So when you conduct the balancing that you have to conduct, I think the results should be clear, as Judge Rakoff found under either the Ninth Circuit test in Canoe or the First Circuit, Fourth Circuit test, excuse me, in Agkaban, this search was unconstitutional because there was no, no one was looking for contraband, and no one was truly looking for evidence of a cross-border crime. You could find, you could articulate in any case how something might have something to do with the border, and it would be unlimited, but in this case, if you really look at the record, it's a purely domestic offense. I'd like to address briefly, if I can, the district court's decision to not to conduct an inquiry of the witnesses who took the Fifth Amendment. There were five defense witnesses. But wasn't that, you know, I understand that the court has to do an inquiry about whether someone's just asserting the Fifth Amendment, even though they don't have real exposure, but when the court has heard the testimony, because this was a bench trial, and heard the testimony of multiple witnesses, of the five that are at issue here in this appeal, they were all working for the defendant, and some of them were present during some of the events that are the subject of the indictment, because this was a speaking indictment. Wasn't it, and I believe, you know, Judge Rakoff said this, it was obvious their exposure. So given that, why was that error? If it was obvious, and their attorneys, you as a defense attorney, I'm sure would want your clients to heed your advice to invoke the Fifth Amendment, should there be any potential liability to them. So how did Judge Rakoff and his defense introduce these people had exposure? Yes, Judge Kahn. First, Judge Rakoff said it's obvious that some of these witnesses had exposure. He laid no sort of factual underpinning as to his finding, and we think if you look at the record, it was clear error, even assuming that was his finding. It was more of an offhand remark during an exchange. But just to focus on one witness, for example, Elvin Mata. He did not work for Mr. Smith. He worked for him. But wasn't he present during the meeting with Mr. Vargas, where the claim was that Mr. Vargas was extorted? So now he's stuck, right? He takes the stand, and depending on what he says, he's witness to one of the events that is the crux of the government's criminal indictment. How does that not expose him to potential liability? So that cuts both ways. He was present. He was an employee of the victim. He wasn't at work for Mr. Smith. He was present during a key event that was introduced at trial through the victim. There is just the mere fact that he was present as an employee of the victim doesn't give him an exposure. But the point is the judge conducted no inquiry of it. Maybe it does. Maybe it does. Maybe it doesn't. But why not have the witness, his counsel, me, the government, in camera if necessary, although this was a bench trial. And the judge can't rely on the representations of defense counsel that I met with him. He was present during this event, and I'm advising him to take the fact. Because if he says one thing, the government may charge him with perjury. If he says something else, he may be a part, you know, or consider him a potential participant. So how, you know, I'm struggling with how that doesn't potentially expose him. And a wise attorney would advise a client to say no under those circumstances. The judge didn't even do that. He didn't even hear from counsel as to the basis for the fifth. It was simply I'm taking the fifth on the advice of my counsel. And what happened here was this is a witness who was going to testify. The government told his counsel, I think your client has exposure. That's in the record. That's it. Of course, you're right, Judge Kahn. He's not going to testify at that point. So what happened is it's the government's representation that the witness has exposure that leads to the witness being unavailable to testify for a critical, meeting at this trial. And that's a dangerous precedent to set. If all that has to happen is the government says you have exposure and here you have five witnesses. Most of our witnesses were unable to testify. It's a dangerous precedent to set when the alternative, a simple colloquy to really explore whether there's exposure is not difficult to happen. If you look at the other, the cases where the court doesn't require a particularized inquiry, these are really obvious where it's like in the Stewart case where it's a co-defendant, for example, or somebody who has been told you're a co-conspirator, you're a subject of an investigation. These were not co-conspirators. These were not people that worked for first response. They were relevant witnesses, but these are not the co-defendants in the case. I've gone well over time. Thank you. Thank you, counsel. We'll hear from you again. And we'll hear now from counsel for the government. Good morning, your honors. May it please the court. I'm Rashmi Bhaskaran. I'm an assistant United States attorney in the Southern District, and I represented the Southern District in the case below. I'll begin my remarks with the border search. And the search of appellant's phone at the border was reasonable under the Fourth Amendment. At the time of this search, no court of appeals had held that a warrant was required to conduct this type of search. And here, the search was supported by ample reasonable suspicion. I think the court's relied heavily on its prior decision in United States v. Levy. And Levy tells us that a search of a notebook on reasonable suspicion that's unrelated to contraband or unrelated to the heartland or border-related crimes is still permissible. And I know that Riley was a search incident to arrest, so I'm anticipating your response to my question. But hasn't the Supreme Court said that searches of cell phones are quite different than searching somebody's possession? A notebook they have with them, a suitcase, a backpack, which is different at the border, right? You want to presumably perhaps search for contraband. And I know there's the exception of digital contraband, somebody suspected of bringing in child porn. But how does that border exception allow the government now to search everyone's phone when people's phones contain so much more than their physical possessions? And the Supreme Court has found even their homes. They track someone's movement. How is that? It seems quite a big leap to expand the border exception that far. So, Your Honor, there's two sides to this letter. It is the government's interest at the border balanced against the individual's privacy interest in the particular object that is being searched. So with respect to the government interest, unlike Riley, the government's interest is at its zenith at the border. And that interest is what? It's stopping contraband? It's stopping things or people that shouldn't come in, right? So, yes, that is how the border exception in Ramsey and in other cases was originally articulated. It is the sovereign's right to control the people and the things that have come through the border. But this court in United States versus Levy did not cabin the government's authority at the border to border-related crimes or contraband. Levy was a securities fraud case. And in that case, it wasn't the Border Patrol agents that were conducting that investigation. It was another government agency. It was the DEA. And the DEA called Border Patrol and said, we have a target who's coming through the border. We would like you to do this search. And rather than reject that sort of law enforcement collaboration that happened at the border, the Levy court said that that type of collaboration should be commended, not condoned. And to return to your question about the balancing of these interests here, the government's interest at the border is high and it is not limited to the then they're basically the exception to border searches should have absolutely no limits. In this case, endorsing the search here would not lead to that result because here there was reasonable suspicion. Of what? That Mr. Smith was engaged in crime. What crime? So at the time, agents were investigating Mr. Smith for racketeering-related offenses, extortion-related offenses, and also money laundering. Okay. So how does that differ from, you know, what did they think he was bringing? Counterfeit money they could search his possessions for, correct? So what did they think his phone would have that would be other than counterfeit, but it's for, they didn't suspect he had child porn, right? Which is contraband or drugs. So I'm trying to understand how there's reasonable suspicion here of a crime for which evidence would be found on his person rather than, you know, that shouldn't come in on his phone. So those agents understood that he was being investigated for these extortion-related offenses and money laundering. There is evidence that he was using his phone in connection with those offenses based on reasonable training experience. So should the government now put an agent from the FBI, all the Department of Office of Inspector Generals at the border to search people's routine phones to see if, hey, they might be involved in tax fraud or maybe they may be involved in, you know, contract fraud. Should they do that? So I believe in this case, by uploading the search, the court would not be endorsing that result because there was actual reasonable suspicion that a crime was taking place. And at the time that this border search took place, in response to some of the points that Judge Chin raised, he had, Mr. Smith had gone to Jamaica, was rejected from entry in Jamaica. You just said something, and I don't mean to interrupt, you said a border crime, and that's what I'm looking for. What's the border crime? So he may have been engaged in criminal activity, racketeering, money laundering, a contract fraud, but where was the border crime? There was suspicion that he was engaged in money laundering, and I think the suspicions prior to his travel, coupled with the circumstances of his travel, he goes to Jamaica, he's rejected, he's sent on the first plane back to Newark, he has just under $10,000 in cash, he's acting evasively at the border. So the money laundering is the cash that he has on him, they can search him for that, right? What evidence of, he can't hide money in his phone, I'm trying to understand what the border crime is. You said border crime, I'm trying to understand it. So I think there was evidence beyond just border crime, and Levy tells us that the search does not need to be limited to border crime. But I also think that money laundering would constitute a type of border-related crime, given the circumstances of his travel, and the fact that he had all that cash, and that he was acting evasively. I just have, I have one question, and I don't want to take up all of your time, and that is on the good faith exception. And actually, two questions. One is on the second prong of the good faith exception, Judge Rakoff found, the government obtained a warrant, albeit 38 days later. When that warrant contains information that was obtained from the very phone, how does good faith apply? That's question one. And two, Judge Rakoff also mentioned that the search of the phone, the primary search of the phone occurred after the warrant was obtained. But I thought there was a forensic search prior to the search warrant being obtained, if you can answer those. Sure, so just to take up the second question first, with respect to the facts, yes, the forensic search happened at the border before a warrant. Some initial review pursuant to that occurred. Then when our office got involved, we sought and obtained a warrant. With respect to your first question, I think the fact that all, that the circumstances of the border search were disclosed to the magistrate judge, the fact that review had begun, and certain facts about that search were in the warrant, actually increases the likelihood that good faith applies here, because the government provided all of the relevant information to the magistrate judge, and the magistrate judge, based on all of those facts, which the government fully applies the court of, granted the government a warrant to continue the search. And that is good, you know, I understand your point, which the government was up front about they had already looked at the phone. But the problem is when you use that information to support your probable cause finding for the warrant. Do you see a problem with that? In this case, I think if you were to look at the warrant, the bulk of the warrant is in fact not based on evidence from the border search. It is based on independent interviews with people from the industry, including victims of Mr. Smith's crimes. How does getting a warrant establish or support good faith for what happened before they got the warrant? So what happened before the warrant is also separately supported by good faith, because at the time that the government's arguing that getting a warrant somehow shows good faith as to what happened earlier, and I'm missing that connection. I mean, there may be independent arguments on there being good faith before, but I don't know how getting the warrant helps as to what happened before. So I think the court's United States versus Thomas, which we cited in our brief is instructed here. In that case, there was a canine search, which was held to be unconstitutional outside of the defendant's apartment. And when you take away, when the court took away that canine search, there was very little left of probable cause. And in that case, the court still upheld the search on the basis of good faith because the agent's law enforcement was entitled to rely on the search warrant having fully apprised the magistrate judge of the circumstances of that search, including the canine search. And then here too, as Judge Rakoff found, good faith applies also because the agents at the border believed that they were acting lawfully when they conducted the forensic examination of the suspect. That's the first prong of this, good faith. And his argument there is that the case law was at least at best in flux, and so they thought they had the authority to... I believe that's correct. And in addition to the Levy case, this court has also approved of searches, highly intrusive bodily cavity searches on a reasonable suspicion standard. And from a good faith perspective, when you couple the court's holding in Levy, that searches at the border are not limited to contraband or border-related crimes, and that law enforcement should be encouraged to, in fact, collaborate in the investigation of crimes. If you think about the circuit's decision in Irving, which talks about whether there's a criminal investigative purpose behind a border search, that that's not relevant to the analysis. And then add in those cases that the Supreme Court and this circuit has upheld for very intrusive bodily cavity searches, the agents at the border were certainly acting in good faith when they sought that forensic search, which was supported by reasonable suspicion and also supported by CBP directives at the time. Let me ask you another question about the search, and then we're going to hear from your opponent, I think, again. So my recollection is that both Alicigui and Kamaldas, which are two cases on this border search that have been already heard, involved non-citizens entering. So assuming if this case is third in that list, I'm not sure if it is or not, this might be different. Is there any difference in terms of the scope of the border search permissibility when we're talking about citizens who are presumptively allowed to enter the country and non-citizens who can be excluded? Your Honor, I don't think so, and I don't think those facts are raised in this case either. Mr. Smith was a U.S. citizen, and so the analysis here does not turn on his citizenship. Okay. Thank you. All right. Thank you very much. We'll hear from Mr. Smith, Mr. Capone again for two minutes. Thank you, Your Honor. I'll address a few points. First, my adversary said that no court has held that a warrant would be required for this type of search. I think that's not right. Judge Rakoff found that two circuit courts would have required a warrant for this case. The Ninth, because the Ninth Circuit has held that a warrant is required if the government's not searching for contraband. And the Fourth, because the Fourth Circuit has held that a warrant is required if the government's not searching for evidence of a cross-border crime. So two circuits would have required a warrant. I want to address Levy, which my opponent raised. Levy involved, obviously, a completely different type of search, the search of a notebook, conceitedly, for securities fraud. But even the court in Levy acknowledged, that this court in Levy acknowledged, that the principal purpose of the border search is to protect unwanted things or persons from entering the country or to investigate things like immigration or terrorism offenses. The court simply, in Levy, simply held that while border agents aren't required to look the other way, if there's evidence of a different crime. So that's at least an acknowledgement that that type of search for evidence of, for generalized evidence of crime, is a less paramount interest, much less paramount interest at the border. And when you contrast that to the privacy interests that are very different, very, very different, inherent in the search of a cell phone with the search of a notebook in Levy, the result has to be different. I don't think you need to overturn or do anything to Levy to acknowledge the obvious, which is that the balancing is different when you're talking about a cell phone versus a notebook. Finally, on the good faith exception on the warrant, my adversary said that the bulk of the probable cause for the warrant came, did not come from forensic search. Well, the bulk of the probable cause for the, for there being evidence of a crime on the phone, more than the bulk, nearly the entirety of it came from the forensic search itself. Sure, there was other general evidence of criminal activity in the warrant, but if you read it, they were only able to establish probable cause for the phone because they had already done a forensic search without a warrant. All right. Thank you, counsel. Thank you both. Well argued. We'll take that matter under advisement.